**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2116-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

BRANDON STILL,

      Defendant-Appellant.

_____

Argued October 15, 2020 – Decided December 10, 2020

Before Judges Alvarez, Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 02-03-0562.

V. Ava Murray argued the cause for appellant Brandon Still (Murray Law Group, LP, attorneys; Brandon Still, on the pro se briefs).

John J. Santoliquido argued the cause for respondent (Damon G. Tyner, Atlantic County Prosecutor, attorney for respondent; John J. Santoliquido, of counsel and on the brief).

PER CURIAM

On April 7, 2003, defendant Brandon Still, tried as an adult, was found guilty of second-degree manslaughter, first-degree felony murder, first-degree robbery, second-degree possession of a firearm for an unlawful purpose, and third-degree unlawful possession of a handgun. Still was subsequently sentenced to an aggregate forty-five-year prison term with a thirty-year parole bar. His conviction was upheld on direct appeal. State v. Still, No. A-5456-02 (App. Div. Apr. 3, 2006), cert. denied, State v. Still, 189 N.J. 648 (2007). His first petition for post-conviction relief (PCR) was filed on May 8, 2007. Relief was denied on August 30, 2010, which this court affirmed on appeal. State v. Still (Still II), No. A-2940-10 (App. Div. Dec. 21, 2012), cert. denied, State v. Still, 214 N.J. 119 (2013).

Still filed a second PCR petition sometime in 2017[1] alleging: (1) his sentence was illegal under Miller v. Alabama, 567 U.S. 460 (2012) and State v. Zuber, 227 N.J. 422 (2017); (2) a new trial was warranted based upon newly discovered evidence that trial counsel should have discovered; and (3) trial counsel was ineffective during plea negotiations. The PCR court denied the petition.

_____

[1] The record fails to indicate the specific date the second PCR petition was filed. It includes certifications ranging from the dates of September 2, 2016 to July 21, 2017.

A-2116-17T4

We affirm because: (1) Still's forty-five-year sentence with a thirty-year parole bar was not the practical equivalent of life without parole and, thus, is not contrary to <u>Miller</u>; (2) the newly discovered evidence was not exculpatory evidence and, thus, not warranting a new trial under <u>State v. Smith</u>, 224 N.J. 36, 49 (2016); and (3) counsel's purported ineffectiveness regarding the State's plea offer was time-barred under <u>Rules</u> 3:22-4(b) and 3:22-12(a)(2), and even if the claim was timely, there was no indication counsel's representation was deficient.

## I.

The underlying trial evidence is detailed in our unpublished decision affirming Still's convictions on direct appeal, which we incorporate by reference. Thus, we briefly mention that during the late hours of March 7, 2001, Still's friend, Brian Cross, got into a dispute at a small gathering at the Pleasantville home of Patrice Brooks, Cross's neighbor. Cross left Brooks's house. About thirty minutes later, Cross with the seventeen-year-old Still[2] in tow, returned to Brooks's house. Within moments, tensions frayed between Cross and Still with Anthony Taliaferro and Charles Martin over smoking a blunt (a cigar laced with marijuana). Taliaferro testified this led to Still and Cross firing handguns and killing Martin. He claimed he heard three shots.

---

[2] Still was born on November 27, 1983.

According to Still, who testified, Martin pulled out a gun resulting in him tussling with Martin and the gun discharged one shot. He denied that he or Cross possessed a gun. The State presented evidence that Martin was by shot by two handguns, once by Cross and twice by Still. Still surrendered to law enforcement three months later. In addition, Still and Cross were charged with taking $50 from Martin and a blunt.

Still was later tried as an adult and convicted of felony murder and related offenses. Following merger, he was sentenced to an aggregate forty-five-year prison term with a thirty-year parole bar. Still was unsuccessful in reversing his convictions on direct appeal. Still, 189 N.J. 648. His first PCR petition on May 8, 2007, was denied by the PCR court, which we affirmed on appeal. Still II, slip op. at 1. His second PCR petition was filed denied by the trial court on December 22, 2017.[3]

Before us, Still raises the following arguments in his initial brief:

> POINT ONE
>
> THE PCR COURT ERRED IN DENYING APPELLANT'S MOTION FOR THE POST-CONVICTION RELIEF [AND] NEW TRIAL BASED

---

[3] The PCR court's order is undated, but the accompanying letter opinion is dated December 22, 2017.

A-2116-17T4

UPON NEWLY DISCOVERED EVIDENCE AND CORRECTION OF AN ILLEGAL SENTENCE.

POINT TWO

THE PCR COURT ERRED IN FAILING TO WEIGH MITIGATING FACTORS IN ACCORDANCE WITH MILLER[4] WHEN CONSIDERING APPELLANT'S MOTION[] TO CORRECT AN ILLEGAL SENTENCE, AS SUCH, APPELLANT IS ENTITLED TO RETROACTIVE RELIEF UNDER THE RULE ANNOUNCED IN MILLER[.]

POINT THREE

THE PCR COURT FAILED TO CONSIDER EACH OF THE FIVE MILLER FACTORS WHICH MITIGATE IN FAVOR OF REDUCING APPELLANT'S CURRENT SENTENCE FROM [FORTY-FIVE] TO [TEN] YEARS IMPRISONMENT[.]

1. THE [APPELLANT'S] CHRONOLOGICAL AGE AND RELATED IMMATURITY, IMPETUOSITY, AND FAILURE TO APPRECIATE RISKS AND CONSEQUENCES[.]

2. THE [APPELLANT'S] FAMILY AND HOME ENVIRONMENT THAT SURROUNDS HIM.

3. THE CIRCUMSTANCES OF THE HOMICIDE OFFENSE, INCLUDING THE EXTENT OF HIS PARTICIPATION IN THE CONDUCT AND THE WAY FAMILIAL AND PEER PRESSURES MAY HAVE AFFECTED HIM.

---

[4]  Miller v. Alabama, 567 U.S. 460 (2012)

4. THE INCOMPETENCIES ASSOCIATED WITH YOUTH, FOR EXAMPLE, HIS INABILITY TO DEAL WITH POLICE OFFICERS OF PROSECUTORS (INCLUDING ON A PLEA AGREEMENT) OR HIS INCAPACITY TO ASSIST HIS OWN ATTORNEY.

5. POSSIBILITY OF REHABILITATION.

POINT FOUR

THE APPELLANT['] S SENTENCE IS ILLEGAL BECAUSE THE SENTENCING JUDGE CONSIDERED INAPPLICABLE AGGRAVATING FACTORS IN DETERMINING THE APPROPRIATE OVERALL SENTENCE[.]

POINT FIVE

THE PCR COURT ERRED IN DENYING APPELLANT'S MOTION FOR [A] NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE.

POINT SIX

THE APPELLANT SHOULD NOT HAVE BEEN PROCEDURALLY BARRED FROM RAISING HIS CLAIM OF INNEFECTIVE ASSISTANCE OF COUNSEL AS APPELLANT'S ARGUMENT FALLS UNDER THE SUPREME COURT'S DECISION IN MILLER[.]

In his reply brief, Still argues:

6

POINT I

WHILE DEFENDANT'S SENTENCE IS NOT THE
PRACTICAL EQUIVALENT OF LIFE-
IMPRISONMENT, THE FACTORS OUTLINED IN
MILLER V. ALABAMA, SHOULD APPLY TO
DEFENDANT WARRANTING A RESENTENCING
HEARING.

POINT II

DEFENDANT RAISES HIS ISSUE OF INEFFECTIVE
ASSISTANCE OF COUNSEL BASED UPON THE
FACTORS OUTLINED IN MILLER V. ALABAMA,
DEFENDANT SHOULD NOT BE TIME BARRED.

II.

We first address Still's claim that he is entitled to be resentenced because his sentence as a seventeen-year-old juvenile was the practical equivalent of a life sentence that is contrary to Miller and State v. Zuber, 227 N.J. 422 (2017).

In Miller, the Supreme Court declared mandatory life imprisonment without parole for juvenile offenders unconstitutional under the Eighth Amendment. 567 U.S. at 479. Based upon prior decisions, the Court recognized that "children are constitutionally different from adults for purposes of sentencing" because they "have diminished culpability and greater prospects for reform," and thus "are less deserving of the most severe punishments." Id. at 471 (quoting Graham v. Florida, 560 U.S. 48, 68 (2010)).

7

The Miller Court stated that a mandatory life sentence without parole for a juvenile convicted of homicide:

> [1.] precludes consideration of [the juvenile's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.
>
> [2.] It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.
>
> [3.] It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.
>
> [4.] Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.
>
> [5.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.
>
> [567 U.S. at 477-78 (citations omitted).]

Miller did not preclude the possibility of a life sentence for a juvenile but reaffirmed the determination made in Graham that such a sentence may not be mandatory and should be "uncommon" given a juvenile's "diminished

culpability and heightened capacity for change[.]" <u>Miller</u>, 567 U.S. at 479. In the "rare" situation where the juvenile's "crime reflects irreparable corruption" or incorrigibility, the court may impose a life sentence. <u>Id.</u> at 479-80 (quoting <u>Roper v. Simmons</u>, 543 U.S. 551, 573 (2005)).

In <u>Graham</u>, the Court determined that a sentencing court may not make the determination "at the outset" that the juvenile will forever pose a risk to society. 560 U.S. at 75. The juvenile must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." <u>Ibid.</u> The Court left the "means and mechanisms for compliance" with its decision to the States. <u>Ibid.</u>

In <u>Montgomery v. Louisiana,</u> the Court determined that <u>Miller</u> was entitled to retroactive effect and held that where a sentence was imposed contrary to <u>Miller</u>, the constitutional infirmity could be remedied by a resentencing or consideration for parole. 577 U.S. ___, 136 S. Ct. 718, 733-36 (2016). The Court explained: "Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity— and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." <u>Id.</u> at 736.

In Zuber, our Supreme Court extended the holding of Miller to any life sentence without parole or its functional equivalent. 227 N.J. at 447-48. The Court held that when a juvenile is tried as an adult and is subject to a lengthy aggregate term that is "the practical equivalent of life without parole," the sentencing court must consider the Miller factors in addition to the aggravating and mitigating sentencing factors set forth in N.J.S.A. 2C:44-1(a) and (b). Zuber, 227 N.J. at 429, 445-47, 450.

The Zuber Court did not define a de facto life term by any specific length and rejected the use of life expectancy tables in deciding whether a lengthy term is effectively a life term. Id. at 450. The Court instructed sentencing courts to consider "the real-time consequences of the aggregate sentence." Id. at 447. It suggested the possibility that a lawfully imposed sentence of life, or the functional equivalent of life, may later be rendered unconstitutional by subsequent facts that establish reform and rehabilitation before expiration of the parole bar. Id. at 451-52. The defendant might "ask the court to review factors that could not be fully assessed when he was originally sentenced—like whether he still fails to appreciate risks and consequences, or whether he may be, or has been, rehabilitated." Id. at 452 (citing Miller, 567 U.S. at 477).

A-2116-17T4

Almost two years after Zuber was decided, we addressed the length of sentence that may qualify as a de facto life term in State v. Bass, 457 N.J. Super. 1, 13-14 (App. Div. 2018), certif. denied, 238 N.J. 364 (2019). We held that a life sentence with a thirty-five-year parole bar imposed on a juvenile was not the functional equivalent of a life sentence, and thus, the defendant was not entitled to resentencing under Zuber, even though the sentencing court had not considered the Miller factors when it imposed sentence. Ibid. We further held that any rehabilitative actions the defendant had taken while incarcerated were matters for the parole board to consider and did not render the sentence unconstitutional. Id. at 14. We explained:

> [D]efendant's sentence is not illegal because he now claims to be rehabilitated as a result of his incarceration. We do not minimize defendant's efforts to rehabilitate himself . . . . However, consideration of these accomplishments is exclusively the province of the parole board and not a means of collateral attack on defendant's sentence—which has been affirmed on direct appeal.
>
> [Ibid.]

Still, who was thirty-four years old when the second PCR court denied him relief, argues the court erred in determining his sentence was not the practical equivalent of life imprisonment without the possibility of parole because it failed to recognize "a person incarcerated in the prison system from

11

the age of seventeen until forty-seven, is institutionalized, not having experienced life outside prison walls as an adult." He advances concerns of quality of life and reintegration into society underlie our Supreme Court's decision in <u>Zuber</u>, and he is not amongst the class of individuals deserving a lengthy prison sentence.

Still cites to <u>Miller</u>, <u>Roper v. Simmons</u>, 543 U.S. 551 (2005) (holding death penalty sentences for juvenile offenders unconstitutional), and <u>Graham</u>, explaining that juvenile offenders like himself have diminished blameworthiness and a high likelihood of rehabilitation. Still asserts his sentence is considered lengthy under <u>Zuber</u>, thereby mandating he be resentenced with consideration given to the <u>Miller</u> factors.

In support of his assertion that his sentence should be considered lengthy under <u>Zuber</u>, Still relies on <u>J.I. v. N.J. State Parole Bd.</u>, 441 N.J. Super 564, 572-73, 584 (App. Div. 2015) (holding a defendant who served around six years in prison on charges related to the repeated sexual molestation of his daughters was released after "serving a lengthy sentence"); <u>Trantino v. N.J. State Parole Bd.</u>, 296 N.J. Super. 437, 492 (App. Div. 1996) (Humphries, J., concurring) (ruling

the defendant had just been released on parole from a "lengthy sentence"[5] for robbery); and <u>Bergen Cty Bd. of Servs. v. Steinhauser</u>, 294 N.J. Super. 507, 509-10 (Ch. Div. 1996) (holding that an incarcerated child support obligor serving a fifteen-year sentence with a seven and one-half-year parole disqualifier for an undisclosed offense was "serving a lengthy sentence").  Still thus argues if the sentences in these decisions are considered "lengthy," then his sentence is "extraordinarily lengthy."

Applying <u>Miller</u> in the context of <u>Zuber</u>, Still contends his sentence is illegal because the sentencing judge considered aggravating factors three (risk of re-offense), six (prior criminal record), and nine (need for deterrence), and no mitigating factors when determining his sentence.  N.J.S.A. 2C:44-1(a)(3), (6) and (9).  Citing <u>State v. Dalziel</u>, 182 N.J. 494, 504-05 (2005), for the proposition that the sentencing judge's deliberative process must include mitigating sentencing factors set forth in the record, Still argues the <u>Miller</u> factors should have been considered at his sentencing.  Thus, he asserts he should be resentenced considering: his age (seventeen-years old) at the time of his offense; his family and home environment; the circumstances of his offense:

---

[5]  The length of the defendant's five-year prison sentence is disclosed in <u>State v. Trantino</u>, 44 N.J. 358, 365 (1965).

A-2116-17T4

any incompetency associated with his youth; and the possibility of rehabilitation. Under these factors, Still contends he should receive a sentence of no more than ten years' imprisonment.

We find no merit in Still's contention that he received the practical equivalent of a life sentence without parole. We adhere to our reasoning in Bass, where we held that an unconstitutional parole-disqualifier term for a juvenile offender would need to exceed thirty-five years, which is five years more than Still's thirty-year parole bar. 457 N.J. Super. at 13-14. Still received a forty-five-year sentence subject to a parole-disqualifier of thirty years for felony murder that he committed at age seventeen. As the PCR court noted, because Still is eligible for parole when he is forty-seven years old, his sentence was not illegal because it was not the practical equivalent of a life sentence without parole. Still's release upon his parole eligibility is within the province of the parole board. Hence, any rehabilitative actions Still may have taken while incarcerated are matters for the parole board to consider and will not render his sentence unconstitutional. Unlike the defendants in Zuber, who would not be eligible for parole until they are seventy-two and eighty-five years old, respectively, 227 N.J. at 428, Still will be eligible for parole when he is forty-

14

seven. Because Still was not entitled to resentencing under Zuber, the sentencing court had no obligation to consider the Miller factors.

III.

Still argues the PCR court erred in denying his motion for a new trial based upon newly discovered evidence because it failed to consider the State's theory for the robbery of money and marijuana was "interwoven"; the jury was not served with special interrogatories to distinguish their findings on the alleged robbery of marijuana from cab fare money; and the relaxed requirements for newly discovered evidence under State v. Nash, 212 N.J. 518, 549-50 (2012).

We briefly discuss the trial testimony before detailing the purported new evidence. Taliaferro testified that he and Martin took a cab to Brooks's house, Martin paid the cab fare, received money back, and Martin had about $50 for a return trip. Atlantic County Prosecutor's Office Investigator Stanley Yeats[6] testified that during Martin's autopsy, the only money on him was eighty cents in his jeans pocket. Taliaferro testified that an unsmoked blunt was on the table in the "back living room," when he rushed out of the house upon seeing Still and Cross brandishing guns. He stated that after Still and Cross fled the house, he returned to the house but couldn't see if the blunt was still there because the

---

[6] According to the State, Yeats's name is misspelled "Yates" in the record.

house was in disarray. Still testified he fled the scene after Martin was shot but he did not mention what happened to the blunt or the alleged cab fare money.

Brooks testified for the defense that when she arrived back at her home following the shooting the police were "right behind [her]." She stated she walked into the house, went back outside, and went back inside "to the den[,]" but never mentioned anything about marijuana or blunts. The trial court charged the jury on felony murder and robbery, stating:

> The statute applicable in this case provides that criminal homicide constitutes murder when it is committed when the actor . . . is engaged in the commission of or attempt to commit . . . certain predicate crimes. And the predicate crime here alleged is that of robbery. And in the course of such crime . . . any person causes the death of a person other than one of the participants.
>
> The State charges that Charles Martin was shot and killed while . . . defendant . . . was engaged in the commission of or attempt to commit . . . the predicate crime of robbery . . . .
>
> Conspiracy to commit the predicate crime of robbery is a separate offense from robbery and the conspiracy to rob cannot be a basis for a conviction of felony murder.
>
> . . . .
>
> [A] person is guilty of robbery if in the course of committing a theft, he either knowingly inflicts bodily injury or uses force upon another or threatens another with or purposely puts him in fear of immediate bodily injury, or either -- or commits or threaten to commit certain crimes . . . .

16

So[,] in order . . . to find . . . defendant guilty of robbery, the State is required to prove . . . defendant . . . was in the course of committing a theft. Secondly, that while in the course of committing the theft, . . . defendant either knowingly inflicted bodily injury or used force upon another . . . . As I said, the State must prove . . . defendant was in the course of committing a theft . . . and . . . that act is considered to be in the course of committing a theft if it occurs in an attempt to commit the theft during the commission of the theft itself . . . .

[T]heft is defined as the unlawful taking . . . of . . . property of another with purpose to deprive him thereof. . . .

A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result.

Over thirteen years later, in a September 2, 2016 certification submitted in support of Still's second PCR petition, Brooks[7] stated:

2. During the police investigation and the trial, I was not asked for information concerning the presence of a box of marijuana cigars, aka, "blunts," in my mother's house on the night of Charles Martin's death.

[3]. When I returned to the house that night, I observed a box of "blunts" lying next to the body of Charles Martin. I removed the box from the room before the police officers arrived and then discarded it outside.

---

[7] Although Brooks now uses the last name of Vega, for the sake of convenience we refer to her by her former last night; we mean no disrespect.

17

[4]. I only recently revealed this additional information within the last year.

Still asserts Yeats's testimony that he discovered a pack of Philly Blunts, is not in conflict with Brooks's certification because "the blunt removed from the living room table by co-defendant Cross. . . was abandoned and collected by [Brooks] along with the other blunts lying next to Martin and then discarded outside."  Still cites to State v. Lindsey, 245 N.J. Super. 466, 474 (App. Div. 1991), arguing the State was required to show beyond a reasonable doubt that there was intent to permanently deprive the owner of the property.

Citing Nash, 212 N.J. at 550, Still asserts trial counsel was ineffective in not obtaining the discoverable exculpatory evidence.  He further contends, citing State v. Carter, 85 N.J. 300, 314 (1981), if the evidence was previously discoverable but not found, it proves his trial counsel was incompetent.

Regarding the State's theory that he could be found guilty of robbery for taking either the blunt or the cab fare money, Still, citing State v. N.I., 349 N.J. Super. 299, 319 (App. Div. 2002), argues "[a] guilty verdict must be reversed if a defendant is charged under two separate theories, there is insufficient evidence to support one of those theories, and a jury is directed to return a general verdict that does not differentiate."

We discern no merit to Still's contentions. The PCR court correctly stated that to obtain a new trial based on newly discovered evidence, Still must show the new evidence is: "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." Smith, 224 N.J. at 49 (quoting Nash, 212 N.J. at 549).

The trial evidence regarding the theft of the blunt does not support Still's contention that Brooks's certification constitutes new evidence and warrants a new trial. The evidence showed that Taliaferro was in possession of a blunt and Martin was in possession of about $50 when he was shot by Still and Cross. Taliaferro testified the blunt was abandoned on a table when he exited the room before the shooting, but he didn't know where the blunt was when he returned after the shooting because the house was in disarray. Yeats's testified that following the shooting, the approximately $50 that Martin allegedly possessed was not in his jeans pocket. Yeats also testified he discovered a pack of Philly Blunt cigars at the scene of the shooting.

In her certification, Brooks states she was never questioned about "a box of marijuana cigars, aka, 'blunts,'" in the house on the night of the shooting.

Brooks continues that when she returned to the home after the shooting, she "observed a box of 'blunts'" next to the victim and removed "the box" from the home and discarded it before police arrived. Her statement implies that the stolen property at issue was a box or pack of Philly Blunts rolled into marijuana cigarettes, when in fact the State claims there was only one partially smoked blunt taken by Still or Cross.

If presented to a jury, this new information would first, be contradictory to Brooks's testimony of finding a box of Philly Blunt cigars at the scene of the shooting, and second, it would not be exculpatory because the stolen property at issue in the robbery was one blunt and about $50 in cash, not "a box" of Philly Blunts. Because Brooks certification does not satisfy Smith's three-part test to determine whether newly discovered evidence warrants a new trial, the PCR court properly rejected Still's request for a new trial.

IV.

We last address Still's claim that he followed trial counsel's ineffective advice not to accept the State's plea offer of an eighteen-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. Still argues trial counsel rejected the plea offer without consulting him and effectively chose to go to trial instead and claim self-defense. In support, he points to three letters trial counsel

20

wrote to him between 2001 and 2002, discussing trial preparation, his prison term exposure, plea discussions, and trial strategy. He certified that had he fully understood the ramifications of not accepting the plea, he would have accepted it, and that from "the very start of th[e] case" he "acknowledged that [he] was responsible for shooting [the victim]." Still further points to receipt of a November 3, 2015 letter from trial counsel – not included in the record, nor apparently presented to the PCR court – stating he "did not recognize 'the enormity of the charges' that [he] faced." Thus, Still asserts counsel "now agrees, as set forth in his letter, . . . [that] my youth and up-bringing as well as my lack of understanding of the law hindered my ability to fully appreciate the implications of rejecting the State's plea offer . . . ." We are unpersuaded.

To establish a prima facie case of counsel ineffectiveness, Still must satisfy the two-part test established in Strickland v. Washington, 466 U.S. 668, 687 (1984), and State v. Fritz, 105 N.J. 42, 58 (1987), requiring that: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the defense. The court properly found Still's claim was untimely because it was raised in a second PCR petition approximately ten years after his initial petition.

Rule 3:22-4(b)(1) provides that a "second or subsequent petition for post-conviction relief shall be dismissed unless . . . it is timely under R. 3:22-

12(a)(2)."  The petition must "allege[] on its face" one of the three criteria: (1) the petition "relies on a new rule of constitutional law . . . that was unavailable during the pendency of any prior proceedings[,]" (2) "the factual predicate for the relief sought could not have been discovered earlier through the exercise of reasonable diligence," or (3) the "petition alleges a prima facie case of ineffective assistance of counsel" of prior PCR counsel.  R. 3:22-4(b)(2).

Still argues he was not able to raise this argument in his first petition in 2007 because it wasn't until the 2017 constitutional ruling in Zuber, that our courts were mandated to consider the detrimental effects of decision-making processes of juvenile offenders and could not sentence them to the practical equivalent of a life sentence without parole.  Still's argument was properly rejected by the PCR court, because as noted above, Still's sentence was not the practical equivalent of life in prison without parole as proscribed by Miller and Zuber.  Moreover, we agree with the court that Still "d[id] not account for his failure to raise th[e] particular ineffective assistance claim regarding plea negotiations in his first PCR [petition], which included three other claims of ineffective assistance on the part of his trial counsel."

As to the merits of Still's claim, we likewise agree with the court that there was no prima facie case of counsel's ineffectiveness and there was no indication

that counsel's performance prejudiced him and deprived him of a fair trial. As the court correctly found, counsel's three letters to Still between 2001 and 2002 "demonstrate[d] that [Still's] trial counsel made him aware of the plea offers" and "[t]herefore [his] claim d[id] not allege a factual predicate that could not have been discovered earlier through the exercise of reasonable diligence." Regarding counsel's purported November 3, 2015 letter stating Still could not appreciate the State's plea offer, it is not part of the record; thus, it is a bald assertion that does not "demonstrate counsel's alleged substandard performance." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). Thus, an evidentiary hearing was not warranted. State v. Preciose, 129 N.J. 451, 462 (1992).

To the extent we have not addressed any remaining arguments, we conclude they are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION